## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
**CHRISTOPHER LAFRENNIE,**                )
                                          )
       **Plaintiff,**                   )
                                          )          **Civil Action No.**
       **v.**                          )          **09-40143-FDS**
                                          )
**MICHAEL J. ASTRUE, Commissioner,**      )
**Social Security Administration,**       )
                                          )
       **Defendant.**                   )
                                          )
_____

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION TO REVERSE AND DEFENDANTS
## MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

     This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying plaintiff Christopher Lafrennie's application for social security disability

insurance ("SSDI") and supplemental security income ("SSI") benefits. Plaintiff contends that the

administrative law judge ("ALJ") erred by (1) finding that plaintiff's carpal tunnel syndrome was

not a severe impairment; (2) finding that plaintiff's residual functional capacity allowed him to

return to his past work; (3) failing to make a proper assessment of the impact of plaintiff's obesity

on his ability to function; and (4) failing to make an adequate assessment of the credibility of

plaintiff's statements regarding pain.

     Pending before the Court is plaintiff's motion to reverse the administrative decision and

the Commissioner's motion to affirm. For the reasons set forth below, the motion to affirm will

be granted and the motion to reverse will be denied.

# I.     Factual Background

Christopher Lafrennie is a 35-year-old high school graduate.  Administrative Record ("AR") at 24.  He is obese; he weighs more than 300 pounds (at a height of about 5 feet 9 inches) and has a body mass index of 43.  *Id.* at 15, 32, 148.  He has previously worked as a packer, a feed hopper filler, and an etcher.  *Id.* at 24-26.  He has not worked since January 16, 2006, the alleged onset date of his disability.  *Id.* at 45.

## A.     Carpal Tunnel Syndrome

Lafrennie has a history of carpal tunnel syndrome ("CTS").  He first underwent surgery for it in January 2005 and then again in May 2005.  *Id.* at 226, 323-24.  While he was recovering from the surgeries, he was seen by Dr. Osama Al-Masri, who observed that he had full range of motion in his hands with no muscle weakness or lack of strength.  *Id.* at 226.  Dr. Al-Masri recommended no further treatment and felt that Lafrennie could return to his normal activities after about six to eight weeks of recovery.  *Id.*  However, Lafrennie continued to report pain and numbness in his hands after the surgeries.  He underwent further electromyography ("EMG") testing and nerve conduction studies in March 2006.  Dr. Daniel Tenenbaum concluded upon the reviewing the test results that "despite a very suggestive history and physical examination there is no electrodiagnostic evidence for [CTS]."  *Id.* at 205.

Lafrennie also had an MRI of his cervical spine in June 2006; Dr. Lan Qin, a neurologist, wrote afterwards that the MRI was "fairly unremarkable" and noted that the EMG report showed "no evidence of carpal tunnel syndrome."  *Id.* at 137.  In July 2006, Lafrennie visited Kelley Prendergast, a physician's assistant, for evaluation of his hand and wrist pain.  Prendergast noted that plaintiff's EMG, MRI, and laboratory tests all came back normal and changed a prior

assessment of bilateral CTS to "pain in forearm." *Id* at 212-13. X-rays taken of Lafrennie's

hands in January 2007 showed no abnormalities. Dr. Thomas Breen, who met with him the same

day, wrote that he "may have had a carpal tunnel syndrome but it sounds like at this point his

predominant problem may be ulnar nerve." *Id.* at 223-24.

**B.     Other Ailments**

In addition to CTS, Lafrennie also alleges that he suffers from depression, sleep apnea,

and pain in his back and knee. He began treatment for depression at Community Healthlink clinic

in Gardner, Massachusetts, in February 2006. Lukas Ushinski, a licensed clinical social worker

from Community Healthlink, wrote in a letter dated October 6, 2008, that Lafrennie's depression

has fluctuated from moderate to severe and that symptoms of his depression include difficulty

falling asleep and staying asleep, anxiety while in public and alone, little to no interest in social

activities, excessive weight gain, impaired concentration, and mood swings. *Id.* at 408. Mr.

Ushinski further noted that Lafrennie's anxiety has increased over time, that he is most anxious

out in public, and that he has isolated himself to his apartment over time. *Id.* For his sleep apnea,

Lafrennie uses a CPAP device, but he still sometimes wakes up at night feeling like he is choking.

*Id.* at 222.[1]

In 2002, Lafrennie injured his back in a slip-and-fall incident. *Id.* at 337. Notes from a

medical visit in June 2005 where his back pain was discussed indicate that Lafrennie was not a

candidate for surgery, that he had physical therapy in the past but did not finish it, and that he had

never been to a pain clinic. *Id.* At the time, he indicated that his back bothered him the most later

in the day, and that Motrin helped a little. *Id.* He also had surgery on his right knee in about

---

[1] "CPAP" stands for continuous positive airway pressure.

1996, and visited Dr. David Fabian on April 6, 2006 for pain in his left knee after he fell on it. *Id.* at 197. Dr. Fabian assessed "[c]ontusion left knee tibial tuberosity" which he thought would "quiet down fairly quickly" and did not think that there was reason for any specific concern. *Id.* When Lafrennie visited again in June 2006 for continuing pain in his left knee, Dr. Fabian ordered an MRI, which showed no "pathology of note." *Id.* at 200-02. Dr. Fabian recommended therapy and ultrasound treatment. *Id.* at 200.

  **C.**  **Consultant Evaluations for Disability**

  On April 12, 2007, Lafrennie underwent a physical examination by Dr. Ronald Jolda, a state disability determination services ("DDS") consulting physician. Dr. Jolda noted that Lafrennie was obese, with body mass index of 43.1. *Id.* at 250. He also noted that Lafrennie had been using a CPAP device for two and half to three years, which helped him moderately with his sleep apnea, but that another sleep study would be done to check the settings on his device because he still woke up at night feeling like he is choking. *Id.* at 250, 254. Dr. Jolda observed that his handgrip, finger dexterity, hand function, sensation, and coordination were all normal and that he used "both hands normally to remove his wallet and his license from his wallet"; he concluded that Lafrennie had "no findings of CTS at this exam." *Id.* at 251, 253-54. Dr. Jolda also found after examination that his back and knees were normal, that he was able to squat 90% and move around without difficulty, and that his concentration was normal with appropriate orientation to person, place, and time. *Id.* at 251-54. Dr. Jolda's assessment that "[m]ental health issues are predominant," and that Lafrennie's "functional capabilities from a physical point of view may be related to decreased exertional capability secondary to his obesity . . . He has some perceived symptomatology of his hands and this will limit the grasping and heavy lifting that he

can do as well as the repetitive work that he can do.  However, his biggest limitation is going to come from the mental health perspective as I see him today." *Id.* at 254.

On March 16, 2007, Dr. Brian O'Sullivan, a DDS consulting psychologist, completed a Psychiatric Review Technique form indicating that Lafrennie had depression and anxiety resulting in moderate restrictions in activities of daily living and in maintaining concentration, persistence, and pace, with no restriction in social functioning.  *Id.* at 239, 246.  Dr. O'Sullivan also completed a Mental Residual Functional Capacity Assessment, indicating that Lafrennie was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *Id.* at 232.  Dr. O'Sullivan further concluded that Lafrennie could learn and remember simple routine instructions provided no more than low-level literacy was needed, and carry out simple, routine directions despite variable concentration due to mood, anxiety, and pain.  *Id.* at 234.  He wrote that Lafrennie would be "too distractible to keep average pace for detailed task but could varying [sic] pace in the average range for simple routine tasks."  *Id.*  Dr. O'Sullivan also noted that he would have difficulty being consistently punctual in the early morning due to "periodic poor sleep, depressive lowering of motivation and occasional anxiety before going out," and that "mid morning or later day routines would be best."  *Id.*  He concluded that there were no other apparent limits, and that Lafrennie could be "socially effective" and "adapt to changes effectively."  *Id.*

On April 24, 2007, Dr. Ludmila Perel, a DDS consulting physician, completed a Physical Residual Functional Capacity Assessment.  In it, she noted that Lafrennie had a body mass index

of 48, and made a primary diagnosis of CTS, back pain, sleep apnea, and obesity. *Id.* at 256. Dr. Perel's assessment was that Lafrennie could lift and/or carry 25 pounds frequently and 50 pounds occasionally; could stand, sit and/or walk for about six hours in an eight-hour work day; was unlimited in his ability to push and/or pull; was limited to occasional stooping, crawling, and climbing of ladders, ropes or scaffolds; and was limited to occasional forceful grasping or twisting, but was otherwise unlimited in his manipulative capabilities including reaching, fingering, and feeling. *Id.* at 257-59. She also noted that Lafrennie's symptoms were "partially credible" and "out of proportion to the objective findings." *Id.* at 258.

## II.    **Procedural Background**

Plaintiff applied for SSDI and SSI benefits on January 16, 2007, alleging that he became disabled on January 16, 2006. The application was denied on initial review on April 25, 2007, and subsequently by a federal reviewing official on March 25, 2008. *Id.* at 13. Plaintiff requested an administrative hearing, which was held on February 26, 2009. *Id.* Both plaintiff, who was represented by counsel, and a vocational expert testified. *Id.*

The ALJ issued its decision on April 14, 2009, finding that plaintiff was not disabled. *Id.* at 19. On July 21, 2009, the Decision Review Board notified plaintiff that although it had selected his case for review, it did not complete its review of his claim during the time allowed, and therefore the ALJ's decision had become final under 20 C.F.R. 405.420(a)(2). *Id.* at 1. Having exhausted his administrative remedies, plaintiff filed this complaint on August 21, 2009. *See* 20 C.F.R. § 405.420(b)(2) (2010).

## III.    Analysis

### A.    Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision

of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).

The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive,"

42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where

reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the

ALJ.  It does not fall on the reviewing court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001)

(citation omitted); *Rodriguez Pagan v. Secretary of Health & Human Servs.*, 819 F.2d 1, 3 (1st

Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record

arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Questions

of law, to the extent that they are at issue in the appeal, are reviewed *de novo*.  *Seavey*, 276 F.3d

at 9.

### B.    Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless he or she is "disabled" within

the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the

definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context

of SSI).  "Disability" is defined, in relevant part, as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous

7

period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment

must be severe enough to prevent the plaintiff from performing not only past work, but any

substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a

claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had . . . a severe impairment or
> combination of impairments, the application is denied; 3) if the impairment meets the
> conditions for one of the 'listed impairments' in the Social Security regulations, then
> the application is granted; 4) if the applicant's 'residual functional capacity' is such
> that he . . . can still perform past relevant work, then the application is denied; 5) if
> the applicant, given his or her residual functional capacity, education, work
> experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[2]  "The applicant has the burden of

production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.

2001).  At that juncture, the ALJ assesses the claimant's residual functional capacity ("RFC") in

combination with the "vocational factors of [the claimant's] age, education, and work

experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . .

kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§

423(d)(2)(A), 1382c(a)(3)(B).

---

[2] "All five steps are not applied to every applicant, as the determination may be concluded at any step
along the process."  *Seavey*, 276 F.3d at 5.

## C.    The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R.

§ 404.1520(a)(4), but concluded that it was unnecessary to proceed past step four.  AR at 15-19.

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity

since January 16, 2006, the alleged onset date of his disability.  *Id.* at 15.

At the second step, the ALJ found that plaintiff had severe impairments of obesity and

depression.  *Id.* at 15-16.  The ALJ also considered plaintiff's history of CTS and sleep apnea, but

concluded that these conditions were not severe impairments within the meaning of the Social

Security Act.  *Id.* at 16.  In determining that CTS did not constitute a severe impairment for

plaintiff, the ALJ noted the negative EMG testing for CTS in March 2006; Dr. Al-Masri's

expectation after the surgeries that plaintiff would make a full recovery; and the fact that plaintiff

did not wear night splints, even though he had been prescribed them.  *Id*.  In determining that

sleep apnea was not a severe impairment, the ALJ referred to Dr. Jolda's evaluation, which

described plaintiff as having normal sleep, and indicated that the use of CPAP had helped plaintiff

with this condition.  *Id*.

At the third step, the ALJ determined that plaintiff's severe impairments of obesity and

depression did not meet the requirements for one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  *Id.* at 16-17.

The ALJ then proceeded to the fourth step, considering plaintiff's RFC and past relevant

work.  He determined that plaintiff has the RFC to perform medium work, as defined in 20 C.F.R.

§§ 404.1567(c) and 416.967(c), which involves lifting no more than 50 pounds at a time with

frequent lifting or carrying of objects weighing up to 25 pounds, but with the following

limitations: simple, unskilled tasks working with things rather than people; no more than occasional stooping and crawling; no climbing of ladders; and no more than occasional changes in the work routine. *Id.* at 17-18. In making this finding, the ALJ stated that he considered all of plaintiff's symptoms and that his medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 18. Specifically, the ALJ questioned plaintiff's testimony that he is unable to do dishes because he drops them due to CTS, and that he only leaves his home for medical appointments. The ALJ cited to the negative EMG testing for CTS in March 2006; the "equivocal findings" by Dr. Breen regarding CTS in January 2007; Dr. Jolda's observation that plaintiff's upper extremity functioned normally and that he used his hands normally to remove his wallet and his license from wallet; the fact that no treating or examining source has indicated that plaintiff has difficulty leaving his home due to the medical condition; and the fact that Dr. Jolda observed plaintiff to exhibit normal mental functioning. *Id.* The ALJ concluded that plaintiff "appear[ed] to exaggerate his symptoms and his subjective complaints are not supported in the medical record." *Id.* at 19.

Comparing plaintiff's RFC with his past relevant work, the ALJ found based on the vocational expert's testimony that he could perform his past relevant work as an etcher or a plastics packer. *Id.* Because plaintiff had the RFC to perform his past relevant work, the ALJ concluded that he was not "disabled" within the meaning of the Social Security Act. *Id.*

Plaintiff contends that the ALJ erred by (1) finding that his CTS was not a severe impairment; (2) finding that his RFC allowed him to return to his past work as an etcher or a

plastics packer; (3) failing to assess properly the impact of his obesity on his ability to function; and (4) failing to assess adequately the credibility of his statements regarding pain.

**D.  Severity of CTS**

Plaintiff contends that the ALJ's determination that he did not have a severe impairment of CTS was erroneous and is unsupported by substantial evidence.  Specifically, he argues that the ALJ rejected Dr. Perel's finding that he had "a serious problem with CTS and that he was limited in handling," and also overlooked Dr. Jolda's finding that the "perceived symptomatology of his hands" will limit "the repetitive work that he can do."  Pl. Mem. at 3; AR at 254.  The Commissioner argues that the ALJ's determination with respect to CTS was supported by substantial evidence, and that the medical evidence post-dating plaintiff's alleged disability onset date of January 16, 2006 indicates that CTS was no longer present as a medically determinable impairment.  Def. Mem. at 11.

Step two of the sequential evaluation process requires the Commissioner to determine whether a claimant possesses a "severe" impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment is not severe unless it "significantly limits" a claimant's physical and mental ability to do basic work activities, including walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.  *See* 20 C.F.R. §§ 404.1521, 416.921.

The ALJ's finding that plaintiff's CTS was not a severe impairment is supported by substantial evidence.  Contrary to plaintiff's assertion, Dr. Perel did not make a finding anywhere in his report that he had a "serious" problem with CTS.  Rather, Dr. Perel observed that his symptoms regarding his impairments including CTS were "partially credible" and "out of proportion to the objective findings."  AR at 258.  While Dr. Perel did indicate in his report that

plaintiff was limited in "handling," he specified that this limitation only affected "forceful" grasping or twisting and that he was otherwise unlimited in other manipulative capabilities, such as reaching, fingering, and feeling. *Id.* at 259. And although plaintiff points to Dr. Jolda's assessment on April 12, 2007, that his "perceived symptomatology of his hands" will limit "the repetitive work that he can do," symptoms "are not enough to establish . . . a physical or mental impairment" or prove disability. *See* 20 C.F.R. §§ 404.1528(a), 416.928(a), 404.1529(a), 416.929(a). In any case, Dr. Jolda explicitly made a finding of no CTS in the same report. *Id.* at 254.

Moreover, the record is replete with additional evidence supporting the conclusion that CTS was not present as a medical determinable impairment after the alleged disability onset date of January 16, 2006. That is true even though plaintiff has a history of CTS for which he underwent corrective surgeries in early 2005, and even though he seems to have continued to experience pain in his hands after the surgeries. In March 2006, plaintiff underwent EMG testing and nerve conduction studies, the results of which were normal; the physician who interpreted the test results concluded that there was no evidence of CTS despite a suggestive history. *Id.* at 205. An MRI in June 2006 and x-rays of plaintiff's hands in January 2007 also did not indicate CTS. Dr. Breen, who met with plaintiff in January 2007, wrote that he "may have had a carpal tunnel syndrome but it sounds like at this point his predominant problem may be ulnar nerve." *Id.* at 137, 223-24. And in April 2007, Dr. Jolda explicitly found after an examination that plaintiff did not have CTS. *Id.* at 254. Accordingly, the ALJ did not err in finding that plaintiff did not have a "severe" impairment in the form of CTS.

D. **Plaintiff's RFC and Past Relevant Work**

Plaintiff further contends that the ALJ's finding that he is capable of performing his past relevant work as an etcher and a plastics packer is in error because he is precluded from doing so by his mental RFC. The ALJ determined in the RFC assessment that plaintiff is limited to "simple, unskilled tasks working with things rather than people" and "no more than occasional changes in the work routine." AR at 18. Plaintiff argues that the ALJ's finding that he is limited to "simple, unskilled tasks" is inconsistent with a higher reasoning level attributed to the jobs of etcher and plastics packer according to the General Educational Development ("GED") reasoning scale in the *Dictionary of Occupational Titles* ("*DOT*") issued by the Department of Labor. Plaintiff also argues that the ALJ failed to consider adequately his low level of literacy, limitation to routine tasks, difficulty with being consistently punctual in the early morning, and limitation in social functioning. The Commissioner contends that all these arguments are without merit because the limitation to "simple, unskilled tasks" is consistent with the GED reasoning level attributed to the jobs of etcher and plastics packer, and because the record indicates that the ALJ did properly take into account plaintiff's low level of literacy, limitation to routine tasks and in social functioning, and difficulty with early-morning punctuality.

1. **GED Reasoning Level**

The *DOT* assigns a GED reasoning level to listed occupations, ranging from one as the lowest level to six as the highest. U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C (4th ed. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. Level 1 requires the ability to "carry out simple one- or two-step instructions" and "deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id*. Level 2 requires the ability to "carry out detailed but uninvolved written or oral

instructions" and "deal with problems involving a few concrete variables in or from standardized situations." *Id.*[3] Plaintiff contends that the ALJ's finding that he is limited to "simple, unskilled tasks" means that he is limited to jobs with GED reasoning level of 1, and because the *DOT* classifies etching and plastics work with GED reasoning level of 2, he is not qualified for that work.

To support the proposition that limitation to "simple" work is inconsistent with GED reasoning level of 2, plaintiff largely relies upon cases from the District of Maine. *See, e.g.*, *Hall v. Barnhart*, No. 03-299-P-C, 2004 WL 1896969, at *2-*3 (D. Me. Aug. 25, 2004); *Flagg v. Barnhart*, No. 04-45-B-W, 2004 WL 2677208, at *5 (D. Me. Nov. 24, 2004); *Briggs v. Astrue*, No. 08-05-B-W, 2008 WL 4849332 (D. Me. Nov. 6, 2008). Since the filing of the parties' briefs, however, the Maine District Court has "reexamined and vacated its line of cases finding a discrepancy between a limitation to simple tasks or instructions and a GED reasoning level of 2." *Alley v. Astrue*, No. 09-636-B-W, 2010 WL 4386516, at *6 n.5 (D. Me. Oct. 28, 2010) (citing *Pepin v. Astrue*, No. 09-464-P-S, 2010 WL 3361841, at *2-*6 (D. Me. Aug. 24, 2010)). The

---

[3]Levels three through six consist of the following:

Level 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

Level 4 - Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form.

Level 5 - Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables.

Level 6 - Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

*Id.*

court in *Pepin* noted that *Hall*, *Flagg*, and their progeny are "increasingly in the minority" on the question of whether a limitation to simple instructions or tasks conflicts with a GED reasoning level of 2, and that "DOT definitions, created by the Department of Labor, are not necessarily totally compatible with regulations created by the Social Security Administration." *Pepin*, 2010 WL 3361841, at *2; *see also id.* at *4-5 (listing cases finding that limitation to simple work is consistent with GED reasoning level 2). It found persuasive the reasoning of the court in *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983-84 (C.D. Cal. 2005), which contrasted the Social Security Administration's separation of a claimant's ability to understand, remember, and carry out instructions into merely two categories ("simple" and "detailed") with the *DOT*'s more graduated scale of six reasoning levels, and determined that the use of the terms "simple" and "detailed" in the Social Security regulations cannot necessarily be equated with the use of the same words in the GED reasoning scale. *Pepin*, 2010 WL 3361841, at *3-4. The court in *Meissl* also highlighted the fact that the term "detailed" in the GED reasoning level 2 appears as part of the phrase "detailed but uninvolved"—"that is, not a high level of reasoning." *Meissl*, 403 F. Supp. 2d at 985.

The Court agrees with the reasoning of the courts in *Pepin* and *Meissl* that a claimant limited to "simple, unskilled tasks" may still be able to perform a job with GED reasoning level 2. The Court also notes that Dr. O'Sullivan indicated in his mental RFC assessment that plaintiff is moderately but not markedly limited in his ability to understand, remember, and carry out detailed instructions. AR at 232. This suggests that plaintiff can understand, remember, and carry out at least some detailed instructions, and is not inconsistent with the ability to carry out "detailed but uninvolved" instructions as described in GED reasoning level 2. Accordingly, the Court finds that

15

the ALJ did not err in determining that plaintiff could perform his past relevant work as an etcher or plastics packer despite a limitation to "simple, unskilled tasks."

Plaintiff also argues that the ALJ failed to ask the vocational expert whether his testimony was consistent with the *DOT* as required by Social Security Ruling 00-4p, and that this omission necessitates remand. SSR 00-4p provides that when there is an apparent conflict between a vocational expert's testimony and the *DOT*, the ALJ must "elicit a reasonable explanation for the conflict before relying on the [vocational expert's evidence] to support a determination [of disability]." SSR 00-4p, 2000 WL 1898704, at *2. While some courts have opined that the ALJ has an affirmative responsibility to ask the vocational expert whether there is a conflict between his testimony and the *DOT*, *see Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008), an ALJ's failure to ask a vocational expert about a possible conflict between his testimony and the *DOT* is harmless unless there actually was a conflict. *Tetrault v. Astrue*, 09-cv-11390-NG, 2011 WL 613701, at *7 (D. Mass. Feb. 11, 2011) (citing *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)).

Here, as in *Tetrault*, the ALJ did not ask the vocational expert whether there was a conflict between his testimony and the *DOT*. However, there was no apparent conflict between the vocational expert's testimony and the *DOT*, and plaintiff did not identify any such conflict. Thus, the omission is harmless and does not necessitate remand.

## 2. <u>Low Literacy</u>

Plaintiff contends that the ALJ failed to consider his low level of literacy in the RFC analysis. However, the vocational expert specifically testified during the hearing that the positions of etcher and plastics packer were suitable for someone with limited reading ability. AR at 36. It

therefore appears that the ALJ took plaintiff's low level of literacy into consideration, and even if he had not, it is not an error necessitating remand, as the jobs of etcher and plastics packer, which the ALJ determined that plaintiff can perform given his RFC, are appropriate for someone with low level of literacy according to the testimony of the vocational expert.

### 3. Limitation to Routine Tasks

Plaintiff contends that the ALJ improperly failed to make a detailed inquiry into his past work, given Dr. O'Sullivan's mental RFC assessment that he is limited to routine tasks. The record, however, indicates that the ALJ took into consideration plaintiff's limitation to routine tasks. In his RFC assessment, the ALJ determined that plaintiff is "limited to no more than occasional changes in the work routine," and during the hearing, the ALJ asked the vocational expert whether someone with this limitation could still perform his past work, to which the vocational expert replied in the affirmative. AR at 18, 35. Plaintiff argues in his reply brief that the ALJ was required by Social Security Rulings 82-61 and 82-62 to make a more detailed inquiry into whether his past work can accommodate his limitation to routine tasks. The Court notes at the outset that the applicability of SSR 82-61 and 82-62 are questionable because they appear on the Social Security website as among the rulings that have been superseded, rescinded, or modified, *see* http://www.ssa.gov/OP_Home/rulings/rulfind2.html. However, even if they did apply, the Court does not read SSR 82-61 and 82-62 to mandate a more detailed inquiry than what the ALJ has done in this case.

SSR 82-61 provides that a claimant will be found "not disabled" if he retains the RFC to perform the demands of a past occupation as actually performed, or as generally required by employers throughout the national economy. SSR 92-61, 1982 WL 31387, at *2. It does not

contain any requirement for a detailed inquiry into a claimant's past work with respect to limitations in his or her RFC. The ALJ in this case determined that plaintiff retains the RFC to perform his past relevant work as actually and generally performed. AR at 19.

SSR 82-62 requires the administrative decision to contain findings of fact with respect to the following: (1) the individual's RFC, (2) the demands of the past occupation, and (3) a finding of fact that the individual's RFC would permit a return to his past occupation. SSR 82-62, 1982 WL 31386, at *4. Here the ALJ's decision complied with all three requirements: it contains an assessment of plaintiff's RFC, a finding that plaintiff's past work as an etcher and a plastics packer does not require the performance of work-related activities precluded by his RFC, and a finding that plaintiff can perform his past work given his RFC. AR at 19. SSR 82-62 also states that the decision whether a claimant retains the RFC to perform past work "must be developed and explained fully in the disability decision" and that "every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." 1982 WL 31386, at *3. Although the ALJ could have explained more fully in his decision whether plaintiff retains the RFC to perform his past work as an etcher and a plastics packer, he obtained from the vocational expert during the hearing evidence regarding the demands of plaintiff's past work as well as testimony that an individual with limitations in plaintiff's RFC (in particular, a limitation to no more than occasional changes in the work routine), would be able to perform plaintiff's past work. In light of the above, the ALJ's inquiry and decision with respect to plaintiff's limitation to routine tasks are not inconsistent with SSR 82-62 and does not necessitate a remand.

### 4. Morning Punctuality

Plaintiff also raises the fact that Dr. O'Sullivan's RFC assessment indicated that plaintiff "would have difficulty being consistently punctual in the early morning so mid morning or later day routines would be best," and that the vocational expert testified during the hearing that the etcher position may not be available in multiple shifts. AR at 234. However, as plaintiff himself acknowledged in his brief, the expert also testified that later shifts would be available for the plastics packer position based on his experience working at a plastics factory. *Id.* at 37. Plaintiff argues that this testimony was based on the expert's personal experience working at a plastics factory and that the expert did not testify, nor did the ALJ inquire, that his experience was representative of plastics factories in general. To the contrary, the ALJ explicitly asked the expert during the hearing whether his experience of later shifts in a plastics factory was customary in that type of industry, and the expert responded in the affirmative. *Id*. Moreover, as the Commissioner points out, the Social Security Rulings permit vocational experts to present evidence based on their own experiences. *See* SSR 00-4p, 2000 WL 1898704, at *2. Thus, plaintiff's argument with respect to this issue is without merit.

### 5. Limitation in Social Functioning

Plaintiff also claims that the ALJ, after finding that he had moderate difficulties in social functioning, failed to make allowance for this limitation in his RFC assessment. This argument is also without merit, as the ALJ specifically stated in his RFC assessment that plaintiff was limited to working "with things rather than people." AR at 18. The ALJ also asked the vocational expert during the hearing whether someone with such a limitation could still perform plaintiff's past work, and the vocational expert answered in the affirmative. *Id*. at 35. Thus, the record makes

clear that the ALJ did take into account plaintiff's difficulty in social functioning when assessing his RFC, and remand is not necessary on that basis.

### E. Impact of Plaintiff's Obesity on His Ability to Function

Plaintiff next argues that the ALJ failed to comply with SSR 02-1p, which required the ALJ to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe," and that the ALJ did not explain how plaintiff's obesity affected his RFC. SSR 02-1p, which provides guidance on how obesity is evaluated in disability claims, states that the Social Security Administration "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p, 2000 WL 628049, at *4. It is clear that this provision relates to step two of the sequential evaluation process when trying to determine whether a claimant's obesity is a "severe" impairment.

In this case, the ALJ did consider the impact of plaintiff's obesity on his functioning when deciding whether his obesity is a severe impairment. In finding that his obesity is a severe impairment, the ALJ discussed its impact on his physical functions as determined by Dr. Perel, including the fact that plaintiff can lift 50 pounds occasionally and 25 pounds frequently; can sit, stand, and walk for about 6 hours during the day; is unlimited in his ability to push and pull; can balance, kneel, crouch, and climb ramps and stairs frequently; and can stoop, crawl, and climb ladders, ropes, and scaffolds occasionally. AR at 15-16. The ALJ relied on this assessment in determining that plaintiff had a severe physical impairment of obesity.

SSR 02-1p also states with respect to assessing RFC that "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and

necessary physical activity within the work environment." 2000 WL 628049, at *6. Although the ALJ did not explicitly mention obesity in his RFC assessment, given that he found obesity to be plaintiff's only severe physical impairment, it is reasonable to believe that the ALJ took his obesity into account when determining his physical RFC. Indeed, the ALJ's physical RFC assessment largely mirrors the physical RFC assessment of Dr. Perel, upon which the ALJ relied to find that his obesity was a severe impairment. Thus, the Court finds that plaintiff's argument that the ALJ failed to assess the impact of obesity upon his ability to function is without merit.

###    F.    Credibility of Plaintiff's Statements Regarding Pain

Finally, plaintiff contends that the ALJ did not adequately assess the credibility of plaintiff's statements regarding pain. As a general matter, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[is] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRose v. Sec'y of Health & Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986)). However, the ALJ "must make specific findings as to the relevant evidence he considered in determining to disbelieve" the plaintiff. *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). Here, the ALJ found that plaintiff's statements concerning "the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [ ] residual functional capacity assessment," AR at 18, and supported this credibility determination with specific evidence. For example, the ALJ questioned plaintiff's testimony that he is unable to do dishes because he drops them due to his CTS by pointing to some of the evidence in the record undermining his claim of CTS, including negative test results for CTS and Dr. Jolda's observation that plaintiff used his

hands normally to remove his wallet and his license from his wallet. *Id*. In addition, in response to plaintiff's testimony that he only leaves home for medical appointments, the ALJ noted the lack of evidence in the record to support such a statement. *Id*.

Plaintiff further argues that the ALJ has not specifically discussed the factors for assessing subjective complaints of pain set forth in *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986). Those factors are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) plaintiff's daily activities. *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986); *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Although the ALJ did not explicitly discuss every one of these factors in his decision, he was not required to do so. *Deforge v. Astrue*, 09-cv-30173-MAP, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010). In any case, they were discussed and considered during the hearing. During the hearing, plaintiff testified regarding the nature, location, and severity of pain that he experienced, including headaches and pain in his back, knee, and hands. He testified that he takes medication called Vicodin, which helps with most of his pains. He mentioned that he uses a CPAP device to help with sleep apnea and wears a wrist brace to isolate the pain in his wrists. He discussed his functional restrictions, including the fact that he can walk about a quarter of a mile before he has to stop and rest, and that he does not do dishes because he drops them. He testified regarding his daily activities, specifically that he gets up between 6 a.m. and 7 a.m., spends most of the day sitting, eats food prepared by his wife, watches television, and does some

light chores such as sweeping. AR at 26-27, 29-30. In sum, the ALJ adequately explored the *Avery* factors during the administrative hearing and plaintiff is not entitled to a remand on this basis.

**III.    Conclusion**

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 23, 2011